UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/9/15
```

------------------------------------------------- X

EDWIN VELEZ,

               **Plaintiff,**

       - against -

CAROLYN W. COLVIN
Acting Commissioner of Social Security,

            **Defendant.**

------------------------------------------------- X

**OPINION AND ORDER**

**15 Civ. 0487 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Edwin Velez brings this action, pursuant to the Social Security Act (the "Act"),[1] seeking judicial review of the final decision by the Commissioner of Social Security (the "Commissioner") denying his application for Disability Insurance Benefits ("DIB"). Both parties moved for judgment on the pleadings.

## II.    BACKGROUND

### A.    Procedural History

Velez filed an application for DIB benefits on January 11, 2012,

---

[1]    *See* 42 U.S.C. § 405(g).

which was denied on March 12, 2012.[2]  The application alleged that Velez was

disabled as of June 1, 2010, due to Post-Traumatic Stress Disorder ("PTSD"),

major depression, severe sleep apnea, lower back pain, and Plantar Fasciitis.[3]

Velez requested a hearing before an Administrative Law Judge ("ALJ")[4] and ALJ

Hilton Miller presided over a hearing on July 18, 2013.[5]  Velez, who was

represented by counsel, and vocational expert, Peter Manizi, testified at the

hearing.[6]  On August 27, 2013 the ALJ issued a decision finding that Velez was not

disabled as defined by the Act.[7]  The ALJ's decision became final on November

28, 2014, when the Appeals Council denied Velez's request for review of the

ALJ's decision.[8]  On January 22, 2015, Velez commenced this action by filing a

complaint.  He then moved for judgment on the pleadings on September 9, 2015.

On October 9, 2015 the Commissioner filed an affirmation in opposition to the

---

[2]     *See* Transcript of the Administrative Record ("Tr."), filed as part of
the Commissioner's Answer pursuant to 42 U.S.C. § 405(g), at 61-72, 134-137.

[3]     *See id.* at 152.

[4]     *See id.* at 73-74.

[5]     *See id.* at 29-49.

[6]     *See id.* at 32-49.

[7]     *See id.* at 12-25.

[8]     *See id.* at 1-6.

motion and moved for judgment on the pleadings.

**B.      Administrative Record**

The administrative record consists of non-medical evidence, medical evidence, and hearing testimony.

**1.      Non-Medical Evidence**

Velez was born in 1973 and was thirty-six years old at the onset of his alleged disability.[9]  He resides in the Bronx, New York[10] and has two young daughters who live with his ex-wife in Florida.[11]  Prior to his alleged disability, Velez worked as an operations assistant, corrections officer, and security guard.[12]  He also served in the army from August of 1997 through August of 2005, and in 1999 spent six months in Kosovo as a metal worker.[13]

Velez testified that his medical problems were primarily mental but he suffered from certain physical ailments such as foot pain and low back pain; walking or sitting for long periods of time caused discomfort.[14]  He stated that his

---

[9]      *See id.* at 36.

[10]     *See id.* at 1.

[11]     *See id.* at 36.

[12]     *See id.* at 153.

[13]     *See id.* at 32.

[14]     *See id.* at 32-33

mental conditions resulted in panic attacks, phobias, low self-esteem, nightmares, and anxiety.[15]  He used a CPAP machine to treat sleep apnea which, along with side effects from various medications, caused him to be fatigued and groggy during the day.[16]  He had been prescribed Abilify, Zoloft, Hydroxolynpiomates, and Hydroxizine.[17]

As of the hearing date, Velez's longest period of sobriety since the onset of his alleged disability was only a few months.[18]  He had completed a one-month hospitalization for treatment of alcohol abuse and PTSD just three days before the hearing.[19]  He testified that he would drink up to ten beers each day and often mix them with liquor, and had begun using a patch to help quit smoking.[20]

Velez's regular activities included preparing meals, shopping, doing laundry and reading.[21]  He testified that he did not like traveling alone or going

---

[15]     *See id.* at 32-33, 39.

[16]     *See id.* at 38.

[17]     *See id.* at 35.

[18]     *See id.* at 38.

[19]     *See id.* at 34.

[20]     *See id.* at 35.

[21]     *See id.* at 37.

outside, and that he tended to isolate himself and close the window blinds.[22]

### 2. Medical Evidence: Physical Health

Medical records indicate that Velez has a history of foot problems and back pain. Since December 2005, he has been followed at the Veterans Administration Hospital (the "VA") for his sleep apnea condition, undergoing periodic testing and adjustments to his CPAP device.

On October 15, 2008, Velez saw Dr. Amit Dholakia about lower back pain which he had experienced on-and-off for the previous five years.[23] Dr. Dholakia noted that his back pain was possibly a result of a disc disease, and referred him for an X-ray and physical therapy.[24] The X-ray revealed a posterior subluxation of one of the coccygeal segments.[25]

At a podiatry appointment on May 21, 2009, Dr. Ari Sytner observed that Velez's arches were low, on-and-off weightbearing, and that he had hyperkeratotic lesions at the medial arch area bilaterally.[26] These observations were again noted by Dr. Idit Forkosh on April 1, 2009, who assessed Velez as

---

[22] *See id.* at 39.

[23] *See id.* at 252-253.

[24] *See id.*

[25] *See id.* at 199.

[26] *See id.* at 228.

having pes planus and tylomas.[27]  During a follow-up visit with Dr. Sytner on

January 18, 2012, Velez complained of continued foot pain and tenderness related

to his orthotics.[28]  An X-ray taken that September revealed mild degenerative

arthritis, calcaneal spurs, and no evidence of acute fracture.[29]

On February 27, 2012, Velez met with consulting internal medicine

physician Dr. Sharon Revan for a fuller evaluation.[30]  He complained of a history

of lower back pain, hypertension, flat feet, sleep apnea, anxiety and depression,

panic attacks, high cholesterol, and PTSD.[31]  While Dr. Revas observed that Velez

walked with a limp, she noted that he was able to perform a full squat without

assistance and had no difficulty changing for the exam, getting on and off the exam

table, or rising from a seated position.[32]  She did, however, opine that Velez had

mild limitations with walking and climbing stairs due to flat feet and shortness of

breath.[33]  Subsequently, on September 18, 2012, an examination by Dr. Gautami

---

[27]     *See id.* at 238.

[28]     *See id.* at 281.

[29]     *See id.* at 644.

[30]     *See id.* at 547-550.

[31]     *See id.*

[32]     *See id.*

[33]     *See id.*

Guha showed that Velez's gait was normal.

### 3.   Medical Evidence: Mental Health

#### a.   Dr. Janette Torres-Cruz

Velez began seeking mental health treatment in January of 2006 at the VA in Tampa, Florida.  During an initial visit with Dr. Janette Torres-Cruz, Velez complained of hyper-vigilance, sadness, social isolation, and nightmares.[34]  The doctor diagnosed Velez with Axis I - depressive disorder NOS (not otherwise specified) but ruled out PTSD.   His Global Assessment of Functioning ("GAF") score was 55.[35]  On December 7, 2007, Velez reported feeling depressed and stated that he has been taking medications on-and-off over the past six months.[36]  Dr. Torres-Cruz changed Velez's diagnosis from depressive disorder NOS to major depressive disorder and PTSD and assessed his GAF score at 51.[37]  Velez visited

---

[34]    *See id.* at 372-375.

[35]    *See id.* GAF is a tool used by mental health experts to judge overall levels of functioning and is used for tracking clinical progress.  Diagnostic Statistical Manual of Mental Disorders, 4th ed., American Psychiatric Association (2000) ("DSM–IV").  A GAF score between 51 and 60 is indicative of "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) [or] moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers).  DSM–IV–TR 34.

[36]    *See* Tr. at 420-423.

[37]    *See id.*

Dr. Torres Cruz again in April of 2008 and reported feeling better and less depressed after having taken medications as directed.[38]  Dr. Torres-Cruz raised Velez's GAF to 58.[39]

### b.    Dr. Roberto Figueroa

After moving from Florida to New York, Velez met with Dr. Roberto Figueroa on multiple occasions between October of 2008 and April of 2009.  On October 9, 2008, Velez complained that his depression symptoms were returning.[40] Dr. Figueroa diagnosed him with anxiety disorder NOS but ruled out PTSD and major depressive disorder.[41]  In December of 2008, Velez reported to Dr. Figueroa that he was experiencing better moods and had been taking his medication.[42]  After noting positive mental status exam results, the doctor assigned Velez a GAF score of 62.[43]  At an appointment in February of 2009, Velez reported to Dr. Figueroa that he was feeling upset after having lost his job, but was hopeful and believed

---

[38]    *See id.* at 387-388.

[39]    *See id.*

[40]    *See id.* at 253-254.

[41]    *See id.*

[42]    *See id.* at 245-246.

[43]    *See id.*

that Efexor was helping.[44]  Dr. Figueroa diagnosed Velez with mild depressive disorder, anxiety disorder NOS, and ruled out PTSD.[45]  Velez's GAF score remained at 62.[46]  Dr. Figueroa repeated Velez's GAF of 62 score following a psychiatric medicine reconciliation in March of 2009.[47]

### c.   Dr. Joseph Triebwasser

Velez met with Dr. Joseph Triebwasser on multiple occasions during the time period in which he alleges disability.  During his first visit on November 2, 2011, Velez complained of worsening depression, PTSD symptoms and suicidal ideations.[48]  Velez described his mood as "dark" and that he was experiencing anxiety, irritability, and a lack of motivation.  Velez also reported that he had run out of medication one month earlier, and that his ex-wife was preventing him from seeing his daughters.[49]  Dr. Triebwasser observed that Velez showed no signs of cognitive impairment or formal thought disorder.[50]  After an alcohol assessment

---

[44]     *See id.* at 241-242.

[45]     *See id.*

[46]     *See id.*

[47]     *See id.* at 237-239.

[48]     *See id.* at 524-530.

[49]     *See id.*

[50]     *See id.*

revealed that plaintiff was engaging in excessive drinking on a daily basis, the doctor referred Velez to a substance abuse program and recommended regular psychotherapy sessions.[51]  Dr. Triebwasser assigned Velez a GAF score of 40.[52]

On November 9, 2011, Velez told Dr. Triebwasser that he had resumed taking medications and that he experienced a decrease in his symptoms of paranoia and hypertension.[53]  During the examination, Dr. Triebwasser noted that Velez was attentive, had fluent speech, and had no evidence of cognitive impairment.[54]  He observed that, although Velez's affect was blunted, he was "noticeably brighter" than he was during the previous examination.[55]  That same day, Dr. Triebwasser stated in a letter that Velez had been diagnosed with sleep apnea, hypertension, lumbosacral strain, flat feet, PTSD, and major depressive disorder.[56]

Velez saw Dr. Triebwasser again on December 14, 2011 and reported

---

[51]     *See id.*

[52]     *See id.*  A GAF of 41–50 indicates serious symptoms or serious impairments in social, occupational or school functioning. DSM–IV-34.

[53]     *See* Tr. at 522-523.

[54]     *See id.*

[55]     *See id.*

[56]     *See id.*

that he was "not doing so good."[57]   In addition to revealing that he had been

drinking up to four beers daily, Velez stated that he recently had a fight with his

girlfriend and had been irritated.[58]  Velez stated that felt better when taking

medication, but had run out.[59]  Dr. Triebwasser observed that Velez had no formal

thought disorder or suicidal ideations, but that he had ongoing symptomatology,

which was exacerbated by alcohol use, and "endorsed generalized

suspiciousness."[60]

  At a meeting on February 21, 2012, Velez informed Dr. Triebwasser

that he had abstained from alcohol for one month, but continued to experience

PTSD symptoms, including nightmares.[61]  He also stated that he was socially

distant and lacked motivation.[62]  During examination, Velez was cooperative,

attentive, and had fluent speech.[63]  Dr. Triebwasser noted Velez was taking

medication as directed, and that he was fully oriented and had no signs of cognitive

---

[57] *See id.* at 515-517.

[58] *See id.*

[59] *See id.*

[60] *Id.* at 517.

[61] *See id.* at 492-496.

[62] *See id.*

[63] *See id.*

impairment.[64]  The doctor found no evidence of formal thought disorder but observed that Velez "endorsed generalized suspiciousness."[65]

On July 30, 2012, Velez told Dr. Triebwasser that he was not doing well, and had admitted to using cocaine, alcohol, and marijuana.[66]  Velez said that he had run out of medication but felt better when he was taking them.[67]  His symptoms included irritability, dysphoria, anxiety, and social withdrawal.[68]  Velez also reported vague auditory hallucinations, perceptual illusions, and hyper-vigilance bordering on paranoia, although Dr. Triebwasser found no evidence of a formal thought disorder.[69]  The doctor observed that Velez had not been attending his psychiatric appointments and informed him that the lengthy gaps in treatment were affecting his treatment.[70]  Dr. Triebwasser additionally noted Velez's standing diagnosis for PTSD, major depressive disorder and substance abuse, and repeated

---

[64]    *See id.*

[65]    *Id.* at 495.

[66]    *See id.* at 695-700.

[67]    *See id.*

[68]    *See id.*

[69]    *See id.*

[70]    *See id.*

his GAF score of 40.[71]  One week later, Velez reported feeling slightly better but admitted that he continued to abuse alcohol, cocaine, and marijuana.[72]  Once again, Dr. Triebwasser reinforced the need for Velez to enter a recovery program.[73]

### d.   Examining and Consulting Physicians, Psychologists, and Social Workers

Velez also met with examining and consulting physicians, psychologists, and social workers on several occasions between October of 2011 and November of 2012 for further mental health evaluation and treatment.  During these discussions and examinations, Velez described symptoms that were consistent with PTSD and depression, and revealed the extent of his compliance with treatment plans as well as his alcohol and substance abuse.

On November 25, 2011, Velez informed social worker Lynn Repasky that he had been experiencing occasional panic attacks, poor concentration, and memory problems, but that he felt more motivated over the past three weeks while taking medication.[74]  He told Repasky during a later visit that he had been drinking up to six or more beers each day as a coping mechanism, and complained of

---

[71]   *See id.*

[72]   *See id.* at 689-690.

[73]   *See id.*

[74]   *See id.* at 520-521.

paranoia and sadness.[75]  During subsequent discussions with social worker Tamara

Halsell, Velez revealed that he stopped going to school because he could not

sustain good grades, and complained that he was experiencing stress as a result of

helping his mother to take care of his sick step-father.[76]  He also claimed that he

was under threat of losing his section 8 housing, and expressed a wish to move

back to Florida to be closer to his daughters.[77]

On February 27, 2012, Velez visited psychologist Dr. Arlene Broska

for a psychiatric consultative examination.[78]  Dr. Broska observed that Velez's

thought processes were coherent and goal directed without evidence of

hallucinations, delusions, or paranoia.[79]  She opined that, while Velez may not

always relate adequately with others or appropriately deal with stress, it appeared

that he can maintain a regular schedule, perform complex tasks independently,

make some appropriate decisions, and understand simple directions and

instructions.[80]  She also opined that while Velez's psychiatric and substance abuse

---

[75]     *See id.*

[76]     *See id.* at 509.

[77]     *See id.* at 619.

[78]     *See id.* at 551-555.

[79]     *See id.*

[80]     *See id.*

problems were evident, they did not appear significant enough to interfere with his ability to function on a daily basis.[81]

On July 25, 2012, Velez reported to the Bronx VA for detox admission and was approached by Halsell in the waiting room.[82]  He apologized for not returning her phone calls and stated that he has not been doing well.[83]  She observed that his speech was coherent, his thought process was logical, and his judgment and insight were both fair.[84]  That same day, Velez spoke with social worker Eddie Marcano and admitted that he had been abusing alcohol, cocaine, and marijuana.  Marcano noted that Velez had ceased taking his psychiatric medications, but that he seemed motivated to stop abusing substances and planned to seek outpatient treatment.[85]  Velez met with Marcano again on September 17, 2012, and reported that he was complying with the psychiatric medication treatment plan and experienced an improvement in his mood.[86]  He spoke about stabilizing substance use and mental health, and about re-establishing his

---

[81]     *See id.*

[82]     *See id.* at 707.

[83]     *See id.*

[84]     *See id.*

[85]     *See id.* at 705-706.

[86]     *See id.* at 661.

relationship with his daughters.[87]

On September 11, 2012, Velez met with psychiatrist Dr. Alla Borik and psychiatry fellow Dr. Devendra Singh Thakur in connection with his application for admission to the VA substance abuse clinic.[88]  He admitted to using alcohol, cocaine, and marijuana, and that he was "intermittently adherent" to psychiatric medications.[89]  Dr. Borik noted that Velez's mood and affect were depressed, but he appeared pleasant and cooperative, and made good eye contact.[90]  Dr. Thakur assessed major depressive disorder and PTSD with severe impairing symptoms, as well as regular alcohol and drug use to self-medicate symptoms.[91]

On November 13, 2012, Dr. Thakur and Marcano completed a medical source statement which provided an estimate of Velez's psychiatric or psychological impairment.[92]  Dr. Thakur opined that plaintiff would have extreme limitations in his: ability to relate to others; activities of daily living; maintaining concentration, persistence, or pace; sustaining a routine; and performing activities

---

[87]     *See id.*

[88]     *See id.* at 662-668.

[89]     *See id.*

[90]     *See id.*

[91]     *See id.*

[92]     *See id.* at 723-725.

in a schedule.[93]  She further opined that Velez would have extreme limitations in:
understanding, carrying out and remembering instructions; responding to
customary work pressure; responding appropriately to changes in the work setting;
using good judgment; performing complex, repetitive or varied tasks; and behaving
in an emotionally stable manner.[94]  She also noted that Velez would have marked
limitations in performing simple tasks and responding appropriately to supervisors
and co-workers.[95]  Dr. Thakur indicated Velez was likely to be absent from work
more than four days each month.[96]  She further noted that plaintiff experienced
drowsiness, restlessness, and slowed cognition because of medication and that
stress would likely cause plaintiff's condition to deteriorate.[97]  Dr. Thakur
indicated that Velez would see some improvement if he stopped using drugs but
"many symptoms would likely persist."[98]  The doctor did not acknowledge any
permanent damage resulting from his drug and alcohol abuse.[99]

---

[93]     *See id.*

[94]     *See id.*

[95]     *See id.*

[96]     *See id.*

[97]     *See id.*

[98]     *See id.*

[99]     *See id.*

### e.    Reviewing Physician

On March 7, 2012, psychologist Dr. R. Nobel completed a

Psychiatric Review Technique form based on Velez's medical records.[100]  Nobel

opined that Velez had no significant limitations in activities of daily living and

maintaining concentration, persistence or pace, and moderate limitation in social

functioning.[101]  In a Mental Residual Functional Capacity Assessment, Dr. Nobel

assessed no significant limitations in understanding and memory.[102]  Dr. Nobel

opined that Velez would have a moderate limitation in his ability to work in

coordination with others and in his ability to complete a normal workday and

workweek without interruptions from psychologically based symptoms, but had no

limitations in the area of sustained concentration and persistence.[103]  He believed

that Velez had no limitations in adaptation and moderate limitations in the ability

to interact appropriately with the general public and accept instructions and

respond appropriately to criticism from supervisors.[104]  Dr. Nobel concluded that

Velez could "sustain concentration and attention for his past relevant work as a

---

[100]    *See id.* at 570-571.

[101]    *See id.*

[102]    *See id.*

[103]    *See id.*

[104]    *See id.*

security guard."[105]

### 3.   The ALJ's Decision and Anlaysis

The ALJ applied the five-step sequential process to evaluate Velez's claim.  At step one of his analysis, the ALJ determined that Velez had not engaged in substantial gainful activity ("SGA") since June 1, 2010.[106]  Next, at step two, the ALJ concluded that Velez's severe impairments were low back pain, obesity, bilateral, plantar fasciitis, sleep apnea, hypertension, depressive disorder, PTSD and polysubstance abuse in recent remission.[107]  At the third step, the ALJ determined that Velez "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments."[108]

In the remaining analysis, the ALJ found that Velez had the residual functioning capacity ("RFC") to perform light work as defined by the statute.[109] The ALJ summarized Velez's testimony at the hearing and the medical evidence in the record and determined that, while the underlying medical impairments could

---

[105]   *See id.*

[106]   *See id.* at 17.

[107]   *See id.*

[108]   *Id.* at 17-18.

[109]   *See id.* at 19.

reasonably be expected to cause the complained-of symptoms, "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."[110]  In making this finding, the ALJ found that Velez's hobbies and activities such as cooking, cleaning, and assisting his sick step-father demonstrated that he had sufficient mental capacity to perform unskilled to low-skilled work despite his depression, social anxiety, and substance abuse.[111]  The ALJ further noted that "the claimant reported feeling better when consistently on his medication showing that without substance abuse and consistent medical treatment he can function at a level higher then alleged."[112]  Even though Velez at one point received a GAF score of 40, which indicates major impairment in several areas, the ALJ noted that Velez was drinking heavily and abusing substances at the time of the assessment and therefore "his GAF score was not indicative of his everyday functioning when in remission from his polysubstance abuse."[113]  The ALJ concluded that, with respect to musculosketal allegations, Velez was limited to light work with postural limitations and no foot

---

[110]     *Id.* at 23.

[111]     *See id.*

[112]     *Id.* at 23.

[113]     *Id.* at 22.

controls or pedals, and that his PTSD and depression limited his options to jobs with only occasional contact with others and occasional changes in routine.[114]

Relying on the testimony of a vocational expert, the ALJ concluded that Velez could perform his past work as a security guard or could make adjustments to other work that exists in significant numbers in the national economy, such as photocopying-machine operator or laundry sorter.[115] Accordingly, the ALJ found that Velez "has not been under a disability . . . from June 1, 2010, through the date of the decision."[116]

## III.   LEGAL STANDARD

### A.   Standard of Review

#### 1.   Substantial Evidence Standard

In reviewing an ALJ's decision, a district court does not conduct a de novo review of the ALJ's decision.[117]  The ALJ must set forth the crucial evidence

---

[114]     *See id.* at 23.

[115]     *See id.* at 24-25.

[116]     *Id.* at 25.

[117]     *See Petrie v. Astrue*, 412 Fed. App'x 401, 403 (2d Cir. 2011).  *See also Brickhouse v. Astrue*, 331 Fed. App'x 875, 876 (2d Cir. 2009); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004).

and factors supporting his decision with sufficient specificity,[118] and a district court must uphold a final SSA determination to deny benefits unless that decision is not supported by substantial evidence or is based on an incorrect legal standard.[119] "Substantial evidence is 'more than a scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[120]

"'To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'"[121]  Even if there is substantial evidence for the claimant's position, the Commissioner's decision must be affirmed when substantial evidence exists to

---

[118]    *See McCallum v. Commissioner of Soc. Sec.*, 104 F.3d 353 (Table) (2d Cir. 1996); *Ramos v. Barnhart*, No. 02 Civ. 3127, 2003 WL 21032012, at *6 (S.D.N.Y. May 6, 2003).

[119]    *See Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) ("'In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard.'") (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)).  *See also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").

[120]    *Burgess v. Astrue*, 537 F.3d 117, 127-28 (2d Cir. 2008) (quoting *Richardson v. Perales*, 402 U.S.  389, 401 (1971)).  *Accord Halloran*, 362 F.3d at 31; *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

[121]    *Tarsia v. Astrue*, 418 Fed. App'x 16, 17 (2d Cir. 2011) (quoting *Snell v. Apfel*, 177 F.3d 128, 132 (2d Cir. 1999)).

support

it.[122]  Moreover, the Commissioner's findings of fact, as well as the inferences and

conclusions drawn from those findings, are conclusive even in cases where a

reviewing court's independent analysis of the evidence might differ from the

Commissioner's analysis.[123]

> ## 2.    Full and Fair Hearing

A reviewing court must be satisfied "that 'the claimant had a full and

fair hearing under the Secretary's regulations and in accordance with the

beneficent purposes of the Act.'"[124]  In this regard, the ALJ must affirmatively

develop the record in light of the essentially non-adversarial nature of a benefits

---

[122]    *See Davila-Marrero v. Apfel*, 4 Fed. App'x 45, 46 (2d Cir. 2001)
("'Where there is substantial evidence to support either position, the determination
is one to be made by the factfinder.'") (quoting *Alston v. Sullivan*, 904 F.2d 122,
126 (2d Cir. 1990)).  *See also Johnson v. Commissioner of Soc. Sec.*, No. 14 Civ.
2086, 2015 WL 5854044, at *4 (S.D.N.Y. Oct. 6, 2015).

[123]    *See Hartwell v. Barnhart*, 153 Fed. App'x 42, 43 (2d Cir. 2005).

[124]    *Echevarria v. Secretary of Health and Human Serv.*, 685 F.2d 751,
755 (2d Cir. 1982) (quoting *Gold v. Secretary of Health, Educ., and Welfare*, 463
F.2d 38, 43 (2d Cir. 1972)).  *Accord Jones v. Apfel*, 66 F. Supp. 2d 518, 522
(S.D.N.Y. 1999) (citing *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990))
(explaining that the Act must be liberally construed because it is a remedial statute
that is intended to include, rather than exclude, potential recipients of benefits)).

proceeding.[125] "This duty arises from the Commissioner's regulatory obligations,"[126] which include developing plaintiff's "complete medical history," and making "every reasonable effort" to help the plaintiff get the required medical reports.[127] This duty "exists even when . . . the claimant is represented by counsel."[128] "Where there are gaps in the administrative record, remand to the Commissioner for further development of the evidence is appropriate."[129]

### B.  Five-Step Process

#### 1.  Physical Impairment

Pursuant to the Act, the SSA has established a well-known five-step sequential process to determine whether a claimant is disabled.[130]  At step one, the

---

[125]   *See Lamay v. Commisioner of Soc. Sec.*, 562 F.3d 503, 508 (2d Cir. 2009) *(*quoting *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999)).

[126]   *Pratts*, 94 F.3d at 37.

[127]   20 C.F.R. § 404.1512(d).

[128]   *Pratts*, 94 F.3d at 37 (citing *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996)).

[129]   *Jones*, 66 F. Supp. 2d at 524 (citing *Rosa v. Callahan*, 168 F.3d 72, 82 (2d Cir. 1999)).  *Accord Richardson v. Astrue*, No. 09 Civ. 1841, 2009 WL 4793994, at *8 (S.D.N.Y. Dec. 14, 2009) ("If the ALJ's rationale could be rendered more intelligible through further findings or a more complete explanation, remand is appropriate.") (citing *Pratts*, 94 F.3d at 39).

[130]   *See* 20 C.F.R. § 404.1520(a)(4).

24

ALJ must decide whether the claimant is engaging in SGA.[131]  If the claimant is not engaging in SGA, the analysis proceeds.  At step two, the ALJ must determine whether the claimant has a "severe" medically determinable impairment or combination of impairments that significantly limits the claimant's ability to perform basic work-related activities.[132]  If the claimant has a severe impairment or combination thereof, the analysis must proceed.  At step three, the ALJ determines whether the claimant's impairment meets the criteria of a listed impairment.[133]  If the impairment is contained in the Listings, the claimant is considered disabled.[134]  If the impairment does not meet the Listings, the analysis continues.  At step four, the ALJ determines the claimant's RFC,[135] which is "the most [claimant] can still do despite [her] limitations" with respect to past relevant work.[136]  The ALJ must

---

[131]    See id. § 404.1520(a)(4)(i).

[132]    Id. §§ 404.1520(a)(4)(ii), 404.1520(c), 404.1521(b).

[133]    See id.  Part 404, subpart P, Appendix 1 (hereinafter the "Listings" or "Listing of Impairments").  The Listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just SGA.  See id. § 404.1525(a).

[134]    See id. § 404.1520(d), (a)(4).

[135]    See id. § 404.1520(e), 404.1545.

[136]    Id. § 404.1545(a)(1).

consider all of the claimant's impairments, including related symptoms.[137]  Then, the ALJ must determine whether the claimant has the RFC to perform any relevant work that the claimant has done in the past.[138]  If the claimant is unable to do any past relevant work, the analysis proceeds.[139]  At step five, the ALJ must determine whether the claimant's RFC, age, education and work experience allow her to perform any other work in the national economy.[140]  If so, the claimant is not disabled.  But if she is unable to do other work, the claimant is disabled.

### 2.    "Special Technique" Applied to Mental Impairments

"[T]he Commissioner has promulgated additional regulations governing evaluations of the severity of mental impairments."[141]  The regulations require the application of a "special technique" at steps two and three and at each level of the administrative review process.[142]  The ALJ "must first evaluate [claimant's] pertinent symptoms, signs, and laboratory findings to determine

---

[137]    *See id.*

[138]    *See id.* § 404.1520(f).

[139]    *See id.*

[140]    *See id.* § 404.1520(g)(1).

[141]    *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (citing 20 C.F.R. § 404.1520(a)).

[142]    *Id.*

whether [claimant has] a medically determinable mental impairment[.]"[143]  If a medically determinable mental impairment is found, the ALJ "must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment [or impairments] and document his findings in accordance with paragraph (e) of this section."[144]  The ALJ must then "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c),"[145] which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.[146]  The first three areas are rated on a five-point scale, none, mild, moderate, marked, and extreme; and the fourth area is rated on a four-point scale, none, one or two, three, and four or more.[147]  At step two, "if the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified, then the reviewing authority generally will

---

[143]     20 C.F.R. § 404.1520a(b)(1).

[144]     *Id*.

[145]     *Id*. § 404.1520a(b)(2).

[146]     *See id*. § 404.1520a(c)(3).  "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  *Kohler*, 546 F.3d at 266 n.5 (quotation marks omitted).

[147]     *See* 20 C.F.R. § 404.1520a(c)(4).

27

conclude that the claimant's mental impairment is not 'severe' and will deny

benefits."[148]  But if the claimant's mental impairment is deemed severe, the ALJ

must determine at step three whether the impairment meets or equals the severity

of a mental disorder identified in the Listings.[149]  The ALJ's written decision must

reflect application of the technique, including "a specific finding as to the degree of

limitation in each of the" four functional areas.[150]  Finally, an analysis under the

four broad categories is not a substitute for an RFC determination, which requires a

more detailed assessment.[151]

### C.   The "Treating Physician" Rule

Only acceptable medical sources can be relied on to establish the

existence of a medically determinable impairment or be considered treating sources

whose opinions are entitled to controlling weight under the "treating physician"

rule.[152]  Under the "treating physician" rule, "the medical opinion of a claimant's

---

[148]     *Kohler*, 546 F.3d at 266 (quoting 20 C.F.R. § 404.1520a(d)(1)).

[149]     *See* 20 C.F.R. § 404.1520a(d)(2).

[150]     *Id*. § 404.1520a(e)(2).  *See also id*. § 416.920a(e)(4) ("The decision
must show the significant history, including examination and laboratory findings,
and the functional limitations that were considered in reaching a conclusion about
the severity of the mental impairment(s).").

[151]     *See, e.g., Golden v. Colvin*, No. 12 Civ. 665, 2013 WL 5278743, at *3
(N.D.N.Y. Sept. 18, 2013).

[152]     *See id*. at *2-3.

treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence."[153]  When a treating physician's opinion is not given controlling weight, the regulations require the ALJ to consider several factors in determining how much weight it should receive.  These factors include: (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; and (4) whether the opinion is from a specialist.[154]  After considering the above factors, the ALJ must "comprehensively set forth his reasons for the weight assigned to a treating physician's opinion."[155]  Failure to provide "'good reasons for not crediting the

---

[153]     *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (citing 20 C.F.R. § 416.927(d)(2)).  *Accord* 20 C.F.R. § 404.1527(d)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.").  "Because mental disabilities are difficult to diagnose without subjective, in-person examination, the treating physician rule is particularly important in the context of mental health."  *Roman v. Astrue*, No. 10 Civ. 3085, 2012 WL 4566128, at *18 (E.D.N.Y. Sept. 28, 2012) (citing *Canales v. Commissioner of Soc. Sec.*, 698 F. Supp. 2d 335, 342 (E.D.N.Y. 2010)).

[154]     *See* 20 C.F.R. § 404.1527(d)(2).

[155]     *Newbury v. Astrue*, 321 Fed. App'x 16, 17 (2d Cir. 2009) (quoting *Halloran*, 362 F.3d at 33).  *See also* 20 C.F.R. § 404.1527(d)(2) (stating that the agency "will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion").

opinion of a claimant's treating physician'" is grounds for remand.[156]

### D.    Claimant's Credibility

An ALJ is permitted to consider an individual's activity level in making a determination of credibility.  The ALJ will consider "all of the medical and non-medical information in determining credibility."[157]  Additionally, while "'[a] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability,'"[158] the ALJ "'is not required to accept the claimant's subjective complaints without question; [s]he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'"[159]  In weighing the credibility of the claimant's testimony, her work history is just one of many factors the ALJ may consider.[160]

---

[156]    *Newbury*, 321 Fed. App'x at 17 (quoting *Snell*, 177 F.3d at 133). *Accord Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("Commissioner's failure to provide 'good reason' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error.").

[157]    20 C.F.R. § 404.1529(c)(3)(I).  *See also Rosado v. Shalala*, 868 F. Supp. 471, 472-73 (E.D.N.Y. 1994) (holding that an ALJ may rely on a claimant's activities of daily living as substantial evidence in support of his determination).

[158]    *Montaldo v. Astrue*, No. 10 Civ. 6163, 2012 WL 893186, at *17 (S.D.N.Y. Mar. 15, 2012) (quoting *Horan v. Astrue*, 350 Fed. App'x 483, 485 (2d Cir. 2009)).

[159]    *Id*. (quoting *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010)).

[160]    *See id*. (citing *Schaal*, 134 F.3d at 502).

## IV.   DISCUSSION

### A.   The ALJ's Decision Was Supported by Substantial Evidence

Velez contends the ALJ failed to consider Dr. Triebwasser's GAF score assignment and improperly declined to seek clarification from a medical expert about the score's impact on Velez's limitations, in violation of the instructions contained in the Hearing and Appeals Litigation Law Manual ("HALLEX").[161]   Velez additionally argues that the ALJ failed to take into consideration disability assessments made by the VA prior to the onset of his alleged disability.[162]

The ALJ properly considered Dr. Triebwasser's GAF score assessment of Velez.  GAF scores are not controlling in disability hearings and may be discounted if they conflict with other evidence.[163]   While the ALJ acknowledged that Velez's GAF score of 40 "indicates major impairment in

---

[161]   See Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Mem."), at 20-21, 24.

[162]   See *id.* at 22-23.

[163]   *See Santiago v. Colvin*, No. 12 Civ. 7052, 2014 WL 718424, at *20 (S.D.N.Y. Feb. 25, 2014)  ("Even when the ALJ [considers a GAF score at step four] she need not afford controlling weight to the GAF score, especially if it conflicts with the test administrator's other observations."). *See also Archbald v. Colvin*, No. 14 Civ. 07569, 2015 WL 7294555, at *1 (E.D.N.Y. Nov. 19, 2015) ("[T]he GAF is not standardized, nor is it routinely applied. It has been dropped from the recently issued DSM–V.").

several areas or some impairment in reality testing," he concluded that the score
did not reflect his normal everyday functioning because "the claimant was heavily
drinking and abusing cocaine and cannabis at the time," and was not maintaining
his psychiatric appointments in furtherance of his treatment plan.[164]  The ALJ also
stated that the assistance Velez provided to his mother and stepfather demonstrated
that he can occasionally be around others and maintain a schedule.[165]  These
observations are relevant because a GAF score is merely a "snapshot opinion of
one or more doctors as to an individual's level of social, psychological and
occupational function at a specific point in time[,]" whereas "[a] determination of
disability must be based on the entire record."[166]  Where the ALJ relied on the
relevant evidentiary record to question the accuracy and usefulness of claimant's
GAF score, as he did here, his determination was proper.

   Moreover, the ALJ had no obligation to seek an expert medical
opinion about the significance of Velez's GAF score.  Even if HALLEX bound the

---

[164] Tr. at 22.

[165] *See id.*

[166] *Malloy v. Astrue*, No. 10 Civ. 190, 2010 WL 7865083, at *26 (D.
Conn. Nov. 17, 2010).

ALJ to a certain course of action — which is does not[167] — it provides that an ALJ

has the *discretion* to ask for the opinion of a medical expert, save for special

circumstances that were not implicated in Velez's hearing.[168]  Absent a duty to seek

out additional medical testimony, the ALJ cannot be faulted for relying on the

existing record to inform his conclusion that Velez was not disabled.

Finally, the ALJ's determination of non-disability is not undermined

by his failure to mention the VA's assessments for sleep apnea, flat feet, and back

pain in 2008.  These assessments, which were made while Velez was working full-

time, are not binding on the Commissioner.[169]  While Dr. Revans opined in 2012

that Velez had mild limitations in walking and climbing stairs, the totality of the

---

[167]    *See Harper v. Commissioner of Soc. Sec.*, No. 08 Civ. 3803, 2010 WL 5477758, at *4 (E.D.N.Y. Dec. 30, 2010) ("[T]he HALLEX is simply a set of internal guidelines for the SSA, not regulations promulgated by the Commissioner. A failure to follow procedures outlined in HALLEX, therefore, does not constitute legal error.").

[168]    HALLEX § I-2-5-32 provides that "the need for [medical expert] opinion is left to the ALJ's discretion" except in the circumstances outlined in HALLEX § I-2-5-34 B, which instructs that medical expert opinion is required only when the Appeals Council or a court so orders, or when the ALJ is evaluating background medical test data or considering a finding that the claimant's impairment(s) medically equals a medical listing.

[169]    *See Lohnas v. Astrue*, 510 Fed. App'x 13, 14 (2d Cir. 2013) (holding that an ALJ's failure to consider evidence or standards underlying the determination of disability by the Department of Veterans Affair was not erroneous because disability determinations by other governmental agencies are not binding).

evidence — for instance, observations by multiple doctors that Velez had a normal gait —  does not reveal substantial physical impairment such that a finding of disability under the Act is appropriate.

**B.    The ALJ  Properly Considered Medical Opinion Evidence**

### 1.    Dr. Thakur

Velez argues that the ALJ improperly discounted Dr. Thakur's medical assessment in which she opined that Velez suffered extreme and marked limitations in several areas of mental functioning relevant to vocational aptitude.[170] The Commissioner responds that the ALJ properly doubted the credibility of Dr. Thakur's assessment because she opined that Velez's substantial impairments existed since at least 2006, which is contradicted by the fact that Velez worked full-time between 2006 and 2010.[171]  The Commissioner additionally highlights the ALJ's acknowledgment that Dr. Thakur's examination took place when Velez was drinking heavily, abusing cocaine and cannabis, and adhering to his psychiatric medication only intermittently —  and that proper adherence to treatment plans and abstaining from alcohol and substance abuse has been shown to lead to an

---

[170]     *See* Pl. Mem. at 21.

[171]     *See* Defendant's Opposition to Plaintiff's Motion for Judgment on the Pleadings and in Support of Defendant's Cross-Motion For Judgment on the Pleadings ("Gov't. Mem."), at 23-24.

improvement in Velez's functioning.[172]

The ALJ properly gave less weight to the opinion of Dr. Thakur.  The Court recognizes  that Velez's condition improves and declines based on his lifestyle choices and adherence to his psychiatric medication treatment plan — which the record indicates are strongly correlated with stress-inducing events.  Dr Figueroa, for instance, assigned Velez a GAF score of 62 in October of 2008 and maintained the score for several months while Velez was in compliance with his medication treatment and did not abuse either alcohol or drugs.  It is also noteworthy that Dr. Torres-Cruz raised Velez's GAF score after he reported regularly taking his medication and seeing improvements in his depression symptoms.  That Velez's GAF declined in July of 2012 when he reported heavy alcohol and substance abuse and not taking medication as instructed is evidence of this unfortunate pattern, and it is understandable that Dr. Thakur's assessment during the same month would reveal reservations about Velez's cognitive aptitude. Similarly, Dr. Thakur's opinion that Velez had extreme and marked limitations between 2006 and 2010 is questionable given that, at that time, he was employed on a full-time basis.  On these grounds, the ALJ was justified in treating Dr. Thakur's opinions with skepticism.

---

[172]     *See id.*

### 2. Dr. Broska and Dr. Nobel

Velez argues that the ALJ improperly afforded significant weight to the opinion of Dr. Broska because she examined Velez on only one occasion.[173] Velez additionally contends that the ALJ improperly considered the opinion of reviewing psychologist, Dr. Nobel, as it is not clear whether he had access to Velez's complete medical file or whether his evaluation was sufficient.[174] These arguments, however, overlook that the ALJ afforded significant weight to these opinions in light of a robust record of medical observations that demonstrate a lack of substantial psychological impairment. For instance, with respect to Dr. Broska's opinion, the ALJ noted that significant weight was appropriate because the opinion was "consistent with the claimant's overall level of functioning when he takes his medications and does not abuse substances."[175] Similarly, the ALJ explained that the opinion of Dr. Nobel deserved considerable weight due to Velez's observed cognitive attributes during prior examinations, such as coherent and goal direct thoughts, normal recent and remote memory, and appropriate eye contact[176] Given

---

[173]    *See* Pl. Mem. at 21.

[174]    *See id.* at 22.

[175]    Tr. at 22.

[176]    *See id.*

36

the consistency between Velez's observed capabilities and the opinions expressed in Dr. Broska and Dr. Nobel's opinions, the ALJ properly afforded them significant weight.

### C.    The ALJ Properly Addressed the Plaintiff's Credibility

Velez argues that the ALJ improperly assessed Velez's claim of disability because he was able to engage in household hobbies and errands, and because of gaps in Velez's record of treatment.[177]  Velez specifically takes issue with the ALJ's statements that "the plaintiff is not as tired as he alleges because he testified he cooks, launders, shops, and reads" and that "the plaintiff had occasional treatment from August 2010 to December 2011 yet was able to maintain his appearance and apartment in good order showing that his conditions were not debilitating as he alleges . . ."[178]

While it does not necessarily follow that everyone capable of performing domestic chores, maintaining a clean apartment, and grooming themselves are also capable of holding full-time jobs, the ALJ did not abuse his discretion in finding that Velez was not as tired as he alleged based on the evidence and medical records.  Indeed, "it is within the discretion of the ALJ to evaluate the

---

[177]    *See id.* at 23-24.

[178]    *Id.*

credibility of claimant's testimony and render an independent judgment in light of the medical findings and other evidence regarding the true extent of the symptoms alleged."[179]  Moreover, the degree of fatigue described by Velez would not alone support a finding of disability under the Act.

Finally, the ALJ's reliance on a sixteen month gap in treatment, which occurred subsequent to the alleged onset of disability was not improper.  This Court may not second-guess the ALJ's decision to draw inferences consistent with the weight of a claimant's medical history following a review of the evidentiary record.

## V.    CONCLUSION

For the forgoing reasons, the Commissioner's motion is GRANTED, the decision denying disability benefits is affirmed, and Velez's motion is DENIED.  The Clerk of the Court is directed to close this motion [Docket Nos. 11 and 13], and this case.

---

[179]    *Donnelly v. Colvin*, No. 13 Civ. 7244, 2015 WL 1499227, at *15 (S.D.N.Y. Mar. 31, 2015) (citing *Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999)).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           December 9, 2015

39

**- Appearances -**

**For Plaintiff:**

Alexandra Michalowicz, Esq.
Sullivan & Kehoe, LLP
44 Main Street
Kings Park, NY 11754
(613) 269-1515


**For Defendant:**

John E. Gura, Jr.
Assistant United States Attorney
U.S. Attorney's Office, SDNY
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2750